SCOTT GRIFFIN,

                                        *Plaintiff,*

                    v.

HARTFORD LIFE & ACCIDENT INSURANCE
COMPANY,

                                        *Defendant.*

CASE NO. 6:16-CV-00024

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court upon cross motions for summary judgment. (Dkts. 78 & 79). The controversy in this case revolves around Defendant's decision to cease providing Plaintiff with disability benefits under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant had provided Plaintiff with Long Term Disability ("LTD") benefits, as well as a Life Insurance Waiver of Premium ("LWOP") that exempted him from having to pay his life insurance premium while disabled. Defendant had previously determined that Plaintiff was disabled due primarily to spinal ailments. However, Defendant later decided that Plaintiff was no longer disabled and ceased providing either type of benefit. In accordance with the following reasoning, the Court will hold that Defendant's termination of benefits decision was proper. Thus, Defendant's motion for summary judgment will be granted, while Plaintiff's will be denied.

I.    **Statement of Undisputed Facts[1]**

    a.  **The Benefits Plan**

---

[1] All facts in this memorandum are derived from the Administrative Record ("AR"), Docket Nos. 11-1 and 11-2. Citations to the administrative record are in the form of: (AR [page number]).

1

Plaintiff was employed at MedQuist Transcripts, Ltd. ("Medquist") from 2010 to 2012. (AR 185, 206). Defendant provided policies (the "Policies") for life insurance and disability benefits that Medquist offered to employees such as Plaintiff under the terms of its employee welfare benefit plan. (*See* AR 38–61). The Policies vested Defendant with full discretionary authority to interpret their provisions and provide benefits accordingly. (AR 51). The Policies initially contained different definitions of "disabled" under for LTD and LWOP. The LTD policy employed the "own occupation" definition, while the LWOP interpreted disability to mean being prevented from doing "any occupation." (AR 52; AR 72). Later, the definition for disability under the LTD policy changed to "any occupation" as well. (AR 257). Additionally, the Policies contained several provisions which Defendant claims indicate that the beneficiary had the obligation of establishing his own disability if he wished to receive benefits.[2]

### b. Timeline of Events

Plaintiff's medical problems forced him to stop working in September of 2011. (AR 1020). These problems included atrial fibrillation (heart), degenerations at the C5-6 and C6-7 vertebrae (neck), carpal tunnel syndrome and tennis elbow (arm), and degenerations at L3-4, 4-5, and L5-S1 vertebrae (lower back). (AR 197, 532; AR 189–90, 752; AR 125; AR 672). Plaintiff

---

[2] *See* AR 45:
**Termination of Payment:** *When will my benefit payments end?*
Benefit payments will stop on the earliest of:
    1) the date You are no longer Disabled;
    2) the date You fail to furnish Proof of Loss;
    3) the date You are no longer under the Regular Care of a Physician.
*See also* AR at 72:
To qualify for Waiver of Premium You must:
    1) be covered under the Policy and be under age 60 when You become Disabled;
    2) be Disabled and provide Proof of Loss that You have been Disabled for 9 Consecutive month(s), starting on the date You were last Actively at Work; and
    3) provide such proof within one year of Your last day of work as an Active Employee.

had previously undergone surgery on his lower back vertebrae, but was told no further surgery could be done until the degeneration prevented him from walking. (AR 528). In October of 2011, Plaintiff was granted Short Term Disability ("STD") benefits under the Policies. (AR 1086, 1092). Plaintiff was terminated from his position at Medquist on April 3, 2012, and was approved for LTD benefits on May 3, 2012, on the basis of his cervical and lumbar issues. (AR 325; AR 203, 710, 859). At the end of May, 2012, Plaintiff underwent surgery with Dr. Matthew Sackett to correct his atrial fibrillation. (AR 196, 532). Plaintiff was approved for LWOP benefits on June 17, 2012. (AR 1035).

In March 2013, Dr. Jonathan Carmouche performed neck surgery to treat plaintiff's neck and arm pain. (AR 179). The surgery was largely successful, although there were some lingering symptoms. (AR 179). In June 2013, Defendant began to inquire into Plaintiff's disability claim because it was unclear whether his surgeries had resolved his symptoms, and Dr. Carmouche would not perform a Physical Capacity Evaluation ("PCE") to resolve the question. (AR 178). The investigation was also spurred by the fact that Defendant had noted statements by Plaintiff inconsistent with his disability. (AR 176–77). Namely, Plaintiff had stated that he drove 1.5 hours each way to see Dr. Carmouche and that he continued to aspire to be a musician, even though his condition purportedly prevented him from sitting or playing guitar for prolonged periods of time. (AR 176–77). These inconsistencies were mitigated, however, by the fact that Plaintiff took a rest stop in the middle of the drive and had voice-to-text software to enable him to do songwriting without typing. (AR 176-77).

Pursuant to this inquiry, Defendant employed Nurse Ruth Weddermann to conduct an internal Medical Case Manager ("MCM") review of Plaintiff's medical records. (AR 173–75). In July of 2013, Weddermann ultimately recommended updating Plaintiff's records because it was

not apparent whether Plaintiff's neck surgery had resolved his medical issues. (AR 175). In response, Defendant sought records from Dr. Carmouche and Dr. Bravo (who had begun treating Plaintiff for tendonitis in his arm) but was ultimately unsuccessful in getting either doctor to definitively opine on Plaintiff's disability or agree to do a PCE. (AR 170; AR 165–69). Dr. Carmouche did, however, provide some evidence that Plaintiff had ongoing medical issues. (*See* AR 169 ("Rcvd MRs from Dr. Carmouche confirming [Plaintiff's] statements."); AR 672 ("Severe degeneration at L3-4, 4-5. Degeneration L5-S1.")).

Failing to obtain a definitive statement from his current treating doctors, Defendant utilized another physician, Dr. Teichman, to review Plaintiff's existing medical records and determine whether he was still disabled. (AR 596–600). On February 28, 2014, Dr. Teichman completed his report and concluded that he would have to defer to the treating physicians because there was insufficient information on which he could make his own conclusion. (AR 596–600). Dr. Teichman also noted Dr. Carmouche's statement that "patient reported being unable to sit for more than 10 minutes at a time" and concluded that such a restriction, if it existed, "is not compatible with functionality in a work environment, even at a sedentary level." (AR 592).

On March 12, 2014, Defendant changed its definition of disability for LTD from disability preventing a person from working at their "own occupation" to working at "any occupation," but informed Plaintiff that he still qualified under the new definition. (AR 257). Plaintiff's claim was later referred to a special investigations unit within Defendant's organization. (AR 138). The investigators conducted surveillance on Plaintiff in March 2014 and conducted an interview with him in May. (AR 133; AR 525). Plaintiff's Social Security Disability claims appeal was also denied in May of 2014. (AR 137). In June and August of 2014,

Defendant sent the surveillance video to Plaintiff's treating physicians, and asked whether they were restricting Plaintiff's activities. (AR 129, 131, 245–48). None responded affirmatively, although Dr. Larry McGlothlin did indicate that Plaintiff had some physical limitations and was "very likely to have some disability." (AR 122, 512, 503; AR 443).

On September 5, 2014, Defendant informed Plaintiff that he was no longer considered disabled and would cease receiving disability benefits. (AR 227–33). On September 8th, Defendant informed Plaintiff that his LWOP benefits were also being terminated. (AR 1029–34). Plaintiff appealed the benefits termination on September 30th, but the appeal was denied on November 4, 2014. (AR 441–43; AR 108).

## II.     Standard of Review

### a.     Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.

*See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

### b. Determination of Benefits – Abuse of Discretion vs. *De Novo*

The parties contest whether this Court should review Defendant's benefits determination decision under an abuse of discretion or *de novo* standard. The crux of the disagreement is whether the employees who made the decision as to the termination of benefits were working on behalf of the Defendant, Hartford Life & Accident Insurance Company ("HLAIC"), or whether they were actually agents of Hartford Fire Insurance Company ("HFIC"). Only HLAIC (and its agents) receives abuse of discretion review for its benefits determinations because only HLAIC was delegated full discretionary authority to interpret the Plan.

Generally, "[p]rinciples of trust law require courts to review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, "[w]here the plan provides to the contrary by granting the administrator or fiduciary *discretionary authority* to determine eligibility for benefits, [t]rust principles make a *deferential standard* of review appropriate." *Id.* (internal quotation marks and citations omitted) (emphasis in original). The parties here do not contest that HLAIC was granted discretionary authority and that its decision would be subject to the abuse of discretion standard. The issue, however, is whether the termination decision was actually made by HLAIC, because the employees who made the decision were paid by and technically employees of HFIC.

Several courts have addressed whether decisions made by individuals who are not employees of the entity vested with discretionary authority may still receive deferential review. Plaintiff relies heavily on *Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079 (M.D.

Ala. 2006), in which the Court held that a *de novo* review standard applied when the benefits decision had been made by a separate corporate entity from the one vested with discretionary authority, even though both corporations were affiliates.[3] *See Anderson*, 414 F. Supp. 2d at 1100. In *Anderson*, the corporation vested with discretionary authority assigned benefits determinations to its parent company under a General Services Agreement. *Id*. at 1098. Crucially, that Agreement stated that the parent corporation "is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as the employee, partner or agent" of the subsidiary. *Id*. at 1097. Thus, the *Anderson* court found that the parent company could not have been acting as an agent of the subsidiary primarily because of the express language found in the Agreement. *Id*. at 1099.

However, *Anderson* has been ably differentiated in several cases highly analogous to the instant case. In *Campbell v. United of Omaha Life Ins. Co.*, No. 2:14-CV-00623-JEO, 2015 WL 5818040, at *9 (N.D. Ala. Oct. 6, 2015), *appeal dismissed* (11th Cir. 15-14942, 15-15206) (Jan. 15, 2016), the Court found that "[t]he facts of *Anderson* . . . are readily distinguishable" because of the express non-agency language in the Agreement and the fact that employees in *Anderson* had held themselves out as representatives of the parent company rather than the subsidiary. In

---

[3]     Plaintiff also cites several other cases for the same point. *See Samaritan Health Ctr. v. Simplicity Health Care Plan*, 516 F. Supp. 2d 939, 950 (E.D. Wis. 2007) ("Although discretion regarding benefits may be conferred by the plan on a certain administrator, such that the administrator's decisions are reviewed deferentially, a decision by an unauthorized party is not entitled to such deference . . . ."); *Dubaich v. Conn. Gen. Life Ins. Co.,* 2013 U.S. Dist. LEXIS 108446, *21 (C.D. Cal. July 31, 2013) ("CIGNA bears the burden to prove that the entity which actually denied Dubaich's claim was delegated or granted discretionary authority by the Plan"); *Lucas v. Liberty Life Assur. Co.*, 2014 U.S. Dist. LEXIS 184860, *21 (E.D. Pa. Mar. 28, 2014) ("Liberty Life has the burden of demonstrating that it was the party that actually made the decision to deny a claim for benefit . . . ."). In essence, these cases stand for the proposition that the entity not vested with discretionary authority gets *de novo* review unless it was properly delegated authority. The Court does not disagree with this proposition. Rather, it finds that the entity vested with discretionary authority, HLAIC, was the same one that made the decision to terminate Plaintiff's benefits.

*Campbell*, by contrast, there was no express delegation of decisionmaking, and all communications purported to be on behalf of the corporation vested with discretionary authority. *See Campbell*, 2015 WL 5818040, at *9. Similarly, the court in *Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp. 2d 242, 256 (S.D.N.Y. 2008) addressed "whether a corporation named as a fiduciary in a disability plan governed by ERISA may discharge its duties through the actions of authorized agents who are employed by or otherwise affiliated with the fiduciary's parent corporation." It answered the question in the affirmative, reasoning that a corporation "can only act through its agents," and that the employees in the case were acting on behalf of the fiduciary corporation, even though their salaries derived from another. *Zurndorfer*, 543 F. Supp. 2d at 257. Finally, the court in *MacDonald v. Anthem Life Ins. Co.*, No. 8:12-CV-2473-T-17TBM, 2014 WL 4809534, at *13–14 (M.D. Fla. Sept. 26, 2014), acknowledged *Anderson* while holding that a benefits decision should receive deferential review even when the employees making the decision were paid by a parent company instead of the company given discretionary authority.

Distilling the holdings of these cases, several principles emerge. The fact that an employee derives their salary from one corporation does not necessarily prevent them from exercising the discretionary authority of another. Thus, the dispositive question becomes whether the employee-decisionmaker was acting as an agent for the company vested with discretionary authority, governed by the normal principles of agency. In determining whether such an agency relationship existed, courts have looked to factors such as the letterhead for correspondences and the entity to which responses were directed. In *Anderson,* for example, there were overt expressions that the employees were acting as agents of the parent company rather than the subsidiary that would have received deferential review. In *Campbell*, by contrast, "all of the letters to Campbell and his counsel communicating the status and resolution of his benefits

claims were from United of Omaha and written on United of Omaha letterhead with a United of Omaha address." 2015 WL 5818040 at *9.

Here, the facts indicate that all relevant employees were paid by HFIC and listed as its employee on their W-2's. (*See* dkt. 81-1 at 5). However, HFIC is simply a holding company that does no business of its own and pays the salaries of all employees in the "Hartford family." (*See* dkt. 80-1 ¶¶ 2, 5, 6). Furthermore, all letters addressed to Plaintiff had the "The Hartford" letterhead, which also appeared directly above "Hartford Life and Accident Insurance Co." on the first page of the Plan. (AR 1, 38, 219, 227, 257, 323). Most convincingly, the signature block of each employee indicated that the correspondence was on behalf of HLAIC. (AR 222, 233, 259, 324). There was no indication to Plaintiff at the time that the employees were acting on behalf of HFIC, and Plaintiff only later became aware of their affiliation through discovery in this litigation. All of the evidence indicates that the employees evaluating Plaintiff's claim were agents of HLAIC, which was given discretionary authority to interpret the Plan. Thus, the abuse of discretion standard of review will apply.

"At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008). "To be held reasonable, the administrator's decision must result from a 'deliberate, principled reasoning process' and be supported by substantial evidence." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (quoting *Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long Term Disability Plan*, 509 F.3d 644, 651 (4th Cir.2007)). "Substantial evidence consists of less than a preponderance but more than a scintilla of relevant evidence that 'a reasoning mind would accept as sufficient to support

a particular conclusion.'" *Whitley v. Hartford Life & Acc. Ins. Co.*, 262 F. App'x 546, 551 (4th Cir. 2008). The Fourth Circuit has created eight nonexclusive "*Booth* factors" for a Court to consider in determining whether an entity abused its discretion in ERISA cases such as this:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Williams*, 609 F.3d at 630 (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000)). This Court will apply the abuse of discretion standard to Defendant's decision, employing the *Booth* factors listed above.

## III.    Discussion

In a routine benefits denial case such as this, only these three *Booth* factors are relevant: (1) whether the decisionmaking process was reasoned and principled, (2) the adequacy of material considered to make a decision and degree to which they support it, and (3) the fiduciary's motives and any conflict of interest it may have. Considering these factors, the Court concludes that no reasonable jury would find that Defendant's decision was an abuse of discretion.

### a.    Reasonable Process

Defendant argues that its decisionmaking process was reasonable because it attempted to obtain information about Plaintiff's condition through a wide variety of means and received input from many, often independent, actors. For example, Defendant attempted to hire a contractor to perform a physical examination on Plaintiff, had Nurse Wedderman complete an MCM, tasked Dr. Teichman with conducting an independent review, conducted surveillance on

Plaintiff, interviewed Plaintiff, contacted his physicians at multiple points, and followed the progress of his Social Security Disability benefits appeal. Only after expending substantial time and effort and gathering valuable data over a period of years did Defendant make the decision to terminate Plaintiff's benefits.

Plaintiff presents four primary arguments against the reasonableness of Defendant's decisionmaking process. First, Plaintiff argues that the denial was inherently arbitrary because Defendant denied benefits even though they had no evidence that Plaintiff's condition had changed from the time they had decided to grant him benefits years earlier. Second, he claims the analysis was flawed because Defendant could have definitively resolved the issue by having him physically examined by a doctor of their choice, but they elected not to. The parties agree that Defendant had a right to force Plaintiff to undergo an examination, and Plaintiff also alleges that such an examination was required and would have been less costly than the alternatives Defendant pursued instead. Third, Defendant asserts that the termination relied on a flawed employment analysis. Specifically, he argues the analysis incorrectly described Plaintiff's physical restrictions and assumed he could work at jobs for which he was not qualified. Fourth, Plaintiff claims Defendant's decision was contrary to the advice of several medical professionals, including Defendant's own reviewer, Dr. Teichman, who recommended that he continue to receive disability benefits. As further described below, however, the Court finds that none of Plaintiff's objections are persuasive.

### i. Change in Disability Status After Several Years

Plaintiff's first argument — that Defendant arbitrarily changed his disability status — is largely without merit. Defendant's decision was not arbitrary; it was based on various sources of evidence that were gathered over a period of years, and that were discussed by Plaintiff in depth

in his filings with this Court. Defendant did not suddenly decide to stop providing benefits in September 2014. Rather, the decision was the culmination of an investigation to determine Plaintiff's disability status that spanned much of the period that Plaintiff received LTD benefits. That Defendant continued to provide Plaintiff with disability benefits for years while it was investigating the merits of his claim demonstrates Defendant's good faith rather than its careless decisionmaking. The fact that Defendant denied benefits despite providing them for several years does not indicate that Defendant made an arbitrary decision. *See Hensley v. Int'l Bus. Machines Corp.*, 123 F. App'x 534, 538 (4th Cir. 2004) (reasoning that "the fact that MetLife initially awarded benefits to Hensley does not mean that its subsequent termination of those benefits was the result of unprincipled reasoning" because "[t]he termination of benefits was based on further investigation and review").

Further, Plaintiff is simply factually incorrect that Defendant had no evidence of changes in his condition. Defendant granted Plaintiff's disability benefits when he was seeing several doctors, was considering surgery, and was being restricted in his activities by Dr. McGlothlin. Defendant subsequently denied benefits after Plaintiff had undergone surgery, was no longer regularly seeing his doctors, and was not under any official restrictions on his activities. A changing disability determination in light of changing circumstances is not evidence of an insufficient decisionmaking process.

### ii. Lack of Physical Examination

Plaintiff correctly notes that Defendant had the right to have him physically examined. (AR 47). By not exercising this right and relying on other sources of evidence instead, Plaintiff argues that Defendant improperly made its decision.

Plaintiff argues that Defendant's decisionmaking was flawed because it could have

afforded to pay for a physical examination with the money they spent on surveillance instead. (Dkt. 87 at 14). However, the law does not impose an obligation on Defendant to gather evidence in the way Plaintiff desires. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999) ("[A] plan administrator is under no duty to secure specific forms of evidence.").

At oral argument, Plaintiff also raised the argument that Defendant was contractually *required* to have Plaintiff examined. Plaintiff reasoned that a "full and fair review" under ERISA requires that plan administrators with a right to obtain an examination do so whenever they reject or disagree with the evidence presented by the claimant. *See generally* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(h); *Ellis v. Metro. Life Ins. Co.,* 126 F.3d 228, 236–37 (4th Cir. 1997). Plaintiff argued that the following contractual provision mandates an examination in this case:

> We have the right, at Our expense, to have You examined or evaluated by:
> 1) a Physician or other health care professional; or
> 2) a vocational expert or rehabilitation specialist; of Our choice so that We may evaluate the appropriateness of any proposed modification.

(AR 47). Looking at the plain language of this provision, it is clear that it provides Defendant with a right, but not an obligation to obtain a physical examination. This Court is not aware of, and Plaintiff has not provided, a case supporting Plaintiff's contention that a provision such as this should be interpreted as a requirement rather than a right. Further, the Fourth Circuit has made clear that a "plan administrator is under no duty to secure specific forms of evidence." *Elliott*, 190 F.3d at 609. This Court has also previously addressed this issue, ruling that there was no requirement to affirmatively seek an examination. *See Moore v. Liberty Life Assur. Co. of Boston*, 129 F. Supp. 3d 408, 426–27 (W.D. Va. 2015) ("To the extent that Plaintiff contends that Defendant should have arranged for or paid for further testing, it had no such obligation."). Thus, this Court will decline to impose an unwritten requirement to obtain a physical examination in this case.

Further, the burden of proof in proving disability falls on the claimant. *See Moore*, 129 F. Supp. 3d at 424 ("[T]he claimant in an ERISA case bears the burden to show that she is disabled within the terms of the relevant policy."); *see also Elliott*, 190 F.3d at 608 ("The burden of proving the disability is on the employee."); *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014) ("[T]he primary responsibility for providing medical proof of disability undoubtedly rests with the claimant . . . ."). Plaintiff does not argue, nor plausibly could he, that he was legally unable to obtain a physical examination of himself. Thus, Plaintiff cannot succeed in arguing that Defendant's decisionmaking was flawed because it failed to take a step that: (1) it was not required to take, and (2) that Plaintiff bore the burden to take himself if he thought it would prove his claim.

### iii. Reliance on EAR

Plaintiff has two primary objections to Defendant's reliance on an Employability Analysis Report ("EAR") that showed he was able and qualified to work at several types of jobs. First, he contends that the EAR relied on the faulty assumption that his activities were not being restricted by his doctors, when, in fact, Dr. McGlothlin stated that he believed Plaintiff was disabled and unable to work 40 hours per week in a sedentary position. Second, he argues that the occupations suggested by the analysis were not ones in which he could work because he lacked the necessary training and education.

The first objection is primarily a factual issue. In communications with Defendant, Dr. McGlothlin provided seemingly contradictory answers to questions about Plaintiff's condition. He both indicated that he was not currently restricting Plaintiff's activities, but also checked "no" in response to whether Plaintiff would be "capable of performing activities 40 hours a week primarily seated in nature . . . ." (AR 503). Further confusing the matter, Dr. McGlothlin seemed

Case 6:16-cv-00024-NKM-RSB   Document 97   Filed 01/25/17   Page 14 of 31   Pageid#: 2083

to indicate that the basis for his doubt about Plaintiff's capacity was that he had restricted him in 2012, prior to his surgery. (AR 120, 503). Dr. McGlothlin also provided two letters further describing Plaintiff's condition in 2012. (AR 505, 506). Dr. McGlothlin later clarified that he had seen Plaintiff in July of 2014, and — based on that visit — he believed that Plaintiff was not capable of sitting for long periods without discomfort and pain, and thus was "very likely to have some disability." (AR 443). However, Dr. McGlothlin's conclusion was later muddied in a phone call with Defendant's appeals team in which he reported "he can only suggest lack of function based on [Plaintiff's] self-reported info" and that "he could only guess that . . . [Plaintiff's] condition is likely the same," but could not confirm it. (AR 110). Defendant determined that Plaintiff did not have restrictions for work based on Dr. McGlothlin's lack of restrictions (which he did not amend despite communicating with Defendant on several occasions) and his less-than-definitive suggestion of disability based only on Plaintiff's own statements.

Despite some evidence to the contrary, Defendant was justified in relying on the EAR using the assumption that Plaintiff was not restricted in his activities. Quite simply, there was not a single doctor who would definitively state that Plaintiff's activities were being restricted. On that basis alone, it was not unreasonable for Defendant to conclude that Plaintiff was not restricted in his activities.

Dr. McGlothlin's statements make Defendant's conclusion more questionable because he indicated that: (1) Plaintiff couldn't at a work a job that required sitting at a desk 40 hours a week, (2) Plaintiff was unable to sit or stand for prolonged periods without pain, and (3) that Plaintiff was very likely to have some disability. (AR 503, 443). However, Defendant was justified in discounting these statements. McGlothlin himself clarified that he checked "No" on

15

the 40 hours question only "because he did restrict him in 2012." (AR 120). McGlothlin also admitted that he could only "guess" or "suggest" Plaintiff's limitations, but not "confirm" them. (AR 110–11). Further, McGlothlin at no point contradicted his earlier statement that he was not restricting Plaintiff's activities, and in fact confirmed that he was not restricting Plaintiff because he appeared to be "moving just fine". (AR 120). Therefore, it was not unreasonable for Defendants to conclude that Plaintiff was not being restricted in his activities when they produced the EAR.

The second objection revolves around the meaning in the Policies of "any occupation," which is defined as jobs for which Plaintiff is "qualified by education, training or experience." (AR 51). Plaintiff argues that the jobs suggested by Defendant were not ones for which Plaintiff was qualified.  A court interpreting Hartford's same language has noted that the "Any Occupation" definition does not include "an occupation for which a person *could become* qualified" and instead "must be one for which [the plaintiff] is *already qualified*." *Curtis v. Hartford Life & Accident Ins. Co.*, 64 F. Supp. 3d 1198, 1221 (N.D. Ill. 2014) (emphasis added). If Plaintiff was not qualified to work in any of the jobs he was physically able to perform, he would remain "disabled" under the Policies. Thus, the question is whether the occupations listed by Defendant in its analysis were ones for which Plaintiff was already qualified.

Particularly in comparison to the facts of *Curtis*, Plaintiff appears to be qualified for many of the jobs listed in the EAR. Six of the ten sample occupations were "Closest" matches for Plaintiff, which require minimum training and "familiarization only." (AR 449). The remaining four were "Good" matches which require some training in tools and/or materials. (*Id.*) Overall, Plaintiff was a match for 172 occupations: 46 Closest matches and 126 Good matches. (AR 445, 449). In *Curtis*, by contrast, the only matches were "Fair" or "Potential," which

16

required training in tools and materials. *Curtis*, 64 F. Supp. 3d at 1211. Thus, the facts of the case on which Plaintiff relies are entirely distinguishable from the facts of this case. Further, it is disingenuous of Plaintiff to argue he is not qualified for Closest matches because of the minimum training requirement, when Closest is the highest category of match available in this type of report. (*See* AR 449). Virtually any CPR requires at least some training and familiarization. Under Plaintiff's interpretation, he would never be qualified under this particular type of EAR for any job because they all would require minimum training or familiarization.

Plaintiff further argues that all the jobs listed are at a Specific Vocational Preparation ("SVP") level of two or higher, and all the Closest matches area SVP-4 or higher. Thus, they range in required preparation from "Over 1 month and up to and including 3 months" to "Over 1 year up to and including 2 years." *Specific Vocational Preparation (SVP)*, O*NET OnLine Help, https://www.onetonline.org/help/online/svp (last visited December 8, 2016). Plaintiff asserts that these training periods indicate that these jobs are not ones for which he is immediately qualified, as required under the relevant definitions in the Policies. However, according to the very website cited by Plaintiff, SVP includes "Essential experience in other jobs." *Id*. Therefore, it is more than likely that Plaintiff has already received the requisite preparation from his previous employment as a medical transcriptionist or insurance clerk for several years. (*See* AR 444). Further, common sense dictates that little formal training is required for occupations such as "Receptionist" or "Data Entry Clerk," particularly for an individual such as Plaintiff who has already held similar clerical jobs. (*See* AR 449; AR 444). Under Plaintiff's restrictive view, in contrast, he would be unqualified for essentially any job except for the exact ones he previously held; this cannot be the case.

Plaintiff's two objections to the EAR, therefore, do not rise to the level of an abuse of

discretion on the part of Defendant. Based on the available medical evidence — which Plaintiff could have supplemented had he so desired — Defendant made a reasonable conclusion that Plaintiff could work in a sedentary occupation. Further, Plaintiff was clearly qualified for at least some of the occupations listed in the EAR.

### iv.  Contrary to Advice of Doctors

Plaintiff also claims that Defendant's decision was contrary to the advice of his doctors, namely, the report of Dr. Teichman finding that Plaintiff was still disabled for any occupation and Dr. McGlothlin's statements suggesting he was still disabled.

As an initial matter, it is not clear that the termination was directly contrary to the advice of Plaintiff's doctors. Dr. Teichman's recommendation was based primarily on a lack of information, rather than his affirmative medical opinion that Plaintiff was disabled. (*See* AR 952 ("In the absence of physical examination findings . . . I am forced to defer to the treating physician and his opinion regarding the claimant's level of function.")). Therefore, it is difficult for Defendant's decision to be contrary to Dr. Teichman's opinion when Dr. Teichman had not himself opined on Plaintiff's disability. Further, Dr. Teichman's report was made well before Defendant made its determination, and itself was based on old information. Considering that his conclusions were based on Dr. Carmouche's diagnosis, Dr. Teichman likely would have changed his recommendation in light of Dr. Carmouche's later failure to provide restrictions for Plaintiff. That Dr. Teichman was forced to defer to another doctor based on his limited information has little bearing on Defendant's subsequent decision after additional information had emerged.

As discussed in-depth in other parts of this opinion, Dr. McGlothlin did not provide a definitive statement of disability. While he checked a box indicating that he believed Plaintiff as unable to work 40 hours per week, he later indicated that he did that to reflect the fact that he had

restricted Plaintiff over two years prior. (AR 120). Additionally, while he did indicate that he believed Plaintiff was being truthful about his disability, he clarified that his diagnosis of Plaintiff's disability was based on Plaintiff's self-reported limitations rather than an independent medical examination. (AR 110, 443). Crucially, at no point did Dr. McGlothlin state that he was restricting Plaintiff's activities. Thus, a determination that Plaintiff was not being restricted was not necessarily contrary to the medical opinion of Dr. McGlothlin.

Further, the fact that a defendant makes a decision contrary to the advice of a doctor does not automatically make that decision unreasonable. "[A] claims administrator is 'not obliged to accord special deference to the opinions of treating physicians.'" *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). "[N]or may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Given the very tentative conclusions of the doctors in this case, Defendant might have properly concluded Plaintiff was not disabled based on other evidence. Here, other evidence includes: the surveillance video, Plaintiff's statements during the interview, and a lack of restrictions from any of Plaintiff's other doctors. Weighing all the evidence before it, while not giving dispositive weight to the uncertain conclusion of any one doctor, it was not an abuse of discretion for Defendant to conclude that Plaintiff was not disabled.

### v. Conclusion – Defendant Employed a Reasoned and Deliberate Decisionmaking Process

After considering and dismissing the various allegations as to what Defendant did *not* do, let us now turn briefly to what it did do. Defendant contacted and sought physical examinations from Plaintiff's various doctors at multiple points in the investigation. When that failed, Defendant sought to conduct its own physical examination, but found that too costly due to Plaintiff's remote location. Instead, Defendant employed other investigative methods such as

19

peer review, surveillance, and an interview. Using the evidence before it, Defendant conducted an EAR and identified numerous jobs at which Plaintiff could work. Defendant undertook these various investigations despite Plaintiff having the burden of proving his own disability. While the conclusion to end disability benefits may not have been inescapable, the process employed to reach that decision did not suffer from fatal flaws. Thus, the record supports a finding that Defendant's decisionmaking was "reasoned and principled" under *Booth*.

### b. Substantial Evidence

The next *Booth* factor to consider is "the adequacy of the materials considered to make the decision and the degree to which they support it." The Court finds that there was substantial evidence to support Defendant's conclusion. The following is a description of the evidence relied upon in making the termination decision, and the circumstances surrounding the evidence that might make it more or less probative of Plaintiff's alleged disability.

### i. Non-Reviewable Evidence

As an initial matter, Plaintiff is correct that this Court's review is limited to the rationales given by Defendant in the initial termination letter. *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589, 592–93 (4th Cir. 2007) ("[T]his court has previously held . . . that 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1 require that judicial review be 'limited to whether the rationale set forth in the *initial* denial notice is reasonable.'" (quoting *Thompson v. Life Ins. Co. of N. Am.,* 30 F. App'x. 160, 164 (4th Cir. 2002))); *see also Ferguson v. United of Omaha Life Ins. Co.*, 3 F. Supp. 3d 474, 489 (D. Md. 2014) ("It is well established that, under ERISA, judicial review [is] limited to whether the rationale set forth in the *initial* denial notice is reasonable." (internal quotation marks omitted)). Evidence referenced only in an appeals letter cannot be considered, under the rationale that a plaintiff must have some ability to respond to the reasons for the termination of their benefits. *See Hall*, 259 F. App'x at 593 ("The claimant must then be given

'the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits,' and the claims administrator must take any such materials submitted into account in deciding the appeal." (quoting 29 C.F.R. §§ 2560.503-1(h)(2)(ii), (iv))). Under this standard, then, any evidence not relied on by Defendant in the initial denial letter (AR 227) cannot be considered by the Court in determining whether the decision was reasonable. Thus, some evidence argued in litigation, such as the denial of Plaintiff's Social Security Disability Insurance claim, will not be part of this Court's decision.

### ii. Reviewable Evidence

The following evidence was relied upon by Defendant in its initial termination letter and will be considered by the Court.

#### 1. Dr. Carmouche

Dr. Carmouche was Plaintiff's primary treating physician for his neck problems, specifically "degeneration as C5-6 and C6-7, with disc herniation at both." (AR 752). Dr. Carmouche performed a neck surgery known as foraminotomy surgery on Plaintiff on March 18, 2013. (AR 179). Despite several requests to do so, Dr. Carmouche refused to perform an evaluation of Plaintiff's physical capacities, per his office's policy. (AR 190, 785). Dr. Carmouche was the main source of information for Dr. Teichman's peer review of Plaintiff's medical condition in February 2014. (AR 594–600, 952). According to Dr. Teichman, "[Mr. Griffin] reported being unable to sit for more than 10 minutes at a time and . . . he, Dr. Carmouche, is very hesitant to say otherwise." (AR 952). However, Dr. Teichman also reported that "the likelihood is that the patient can actually do more than [Dr. Carmouche or Plaintiff] thinks [Plaintiff] can do."[4] (AR 598). Dr. Carmouche did not respond to Defendant's letter

---

[4]     The context of this sentence makes clear that the first "he" refers both to Mr. Griffin and Dr. Carmouche. Dr. Teichman intended to communicate that he thought both the patient and

regarding the surveillance video and whether he was currently restricting Plaintiff. (AR 122). One potential reason for his lack of response could be that he had not treated Plaintiff since October 2013, approximately eight months before the June 2014 letter. (AR 122).

### 2. Dr. Bravo

Dr. Bravo treated Plaintiff's arm issues, specifically "right elbow lateral epicondylitis/carpal tunnel syndrome." (AR 125). However, Bravo only saw Plaintiff for treatment once, in August 2013. Accordingly, Dr. Bravo declined to provide an opinion on Plaintiff's capacity in response to Defendant's requests. (AR 160–61, 165). Similarly, Dr. Bravo indicated that he was not currently restricting Plaintiff in response to a letter in July 2014. (AR 512–13).

### 3. Dr. McGlothlin

Dr. McGlothlin is a chiropractor who treated Plaintiff's neck and arm pain. In March and April of 2012, Dr. McGlothlin provided statements as to the severity of Plaintiff's neck and arm pain, and recommended he not work more than two hours per day. (AR 860). Later, McGlothlin responded to Defendant's August 2014 letter and indicated that he was not currently restricting Plaintiff's activities, although he also indicated that he thought Plaintiff was unable to work 40 hours per week in a sedentary occupation. (AR 503). However, he described the basis for his assessment of Plaintiff's ability to work as his restrictions of Plaintiff in April 2012, over two years prior. (AR 120, 503).

After Plaintiff's benefits were denied, Dr. McGlothlin provided information in support of his appeal. (AR 443). Dr. McGlothlin reviewed the surveillance video and stated that it was not indicative of a lack of disability, considering the limited scope of activity it showed. (AR 443). Dr. McGlothlin further stated that "I think Mr. Griffin is being honest about his pain and doctor were overstating Plaintiff's limitations.

22

discomfort. After neck and low back surgery, he is very likely to have some disability." (AR 443). Dr. McGlothlin indicated that he had treated Plaintiff with manipulation on July 25, 2014, and that he believed Plaintiff had some limitations on his functions. (AR 443). However, he later noted in a phone call that his diagnosis was based off of Plaintiff's self-reporting and was only a "guess." (AR 110). Accordingly, he suggested that Defendant have a surgeon physically examine Plaintiff to get a fuller picture of his disability. (AR 110).

### 4. Dr. Teichman

Dr. Teichman served as a peer reviewer of Plaintiffs file, and never physically examined Plaintiff. Based on his peer review, completed February 28, 2014, Dr. Teichman concluded that there was insufficient evidence for an independent review of Plaintiff's disability in his file, and thus he was "forced to defer to the treating physician and his opinion regarding the claimant's level of function." (AR 592). That treating physician was Dr. Carmouche, who opined in a conversation with Dr. Teichman that Plaintiff was unable to sit for more than 10 minutes at a time, based on Plaintiff's self-reported limitations. (AR 592, 598).

### 5. Plaintiff's Statements

Plaintiff made several statements inconsistent with his disability at an interview conducted by Defendant's investigation team on May 21, 2014. Plaintiff stated that he was not seeing any medical professionals and he had not seen a medical professional since October 2013, approximately seven months prior. (AR 525; AR 533–34). Plaintiff reported that he had built his own computer system, and that he sometimes performed IT work for the doctor for whom his mother worked. (AR 544, 558). He also noted the ability to perform a range of everyday activities, including: walking short distances, driving, walking up and down stairs, shopping, lifting reasonable amounts of weight, grasping objects, hand-writing, typing for short periods,

driving for 30–40 minutes, cooking, lace work, and cleaning his house. (*See generally* AR 525–60). Plaintiff, however, also indicated throughout the interview that he had symptoms consistent with his disability, such as difficulty sitting or standing for prolonged periods, difficulty typing, and difficulty putting his body in certain positions. (*See generally* AR 525–60).

### 6. *Surveillance Video*

After observing Plaintiff for four days, Defendant's investigation team was able to produce a one-minute and fifty-three-second video of Plaintiff. (AR 521–24). The footage showed Plaintiff getting in and out of his car and walking approximately fifty feet without any apparent pain of difficulty. (AR 133, 443). Dr. McGlothlin responded to an inquiry about the footage by stating that it did "not tell me anything about [Plaintiff's] condition." (AR 443).

### iii. **Burden of Proof**

Although the parties do not always argue this explicitly, much of their disagreement stems from the issue of the burden of proof — that is, whether Plaintiff must prove he is disabled or Defendant must prove he is not. This disagreement is reflected in the way the parties view each piece of evidence. For example, Defendant continually notes the absence of evidence of disability from various sources, such as when various doctors note that they had not seen Plaintiff recently or were not currently restricting him. Plaintiff, conversely, argues that such an absence indicates that Defendant's decision is not supported by the facts.

As previously discussed, the law in the Fourth Circuit is that the claimant of disability benefits has the burden of establishing their own disability.[5] This burden does not shift simply

---

[5]     *See* Subsection III.a.iii *supra; see also Moore,* 129 F. Supp. 3d at 424 ("[T]he claimant in an ERISA case bears the burden to show that she is disabled within the terms of the relevant policy."); *Elliott*, 190 F.3d at 608 ("The burden of proving the disability is on the employee."); *Harrison*, 773 F.3d at 21 ("[T]he primary responsibility for providing medical proof of disability undoubtedly rests with the claimant . . . ."); *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 361 (4th Cir. 2008) ("Champion produced no evidence showing or tending to show that she

24

because benefits were previously granted. *See Hensley,* 123 F. App'x at 538 ("[T]he decision to grant benefits initially cannot create an obligation by which a plan fiduciary is estopped from later terminating benefits.") (internal quotation marks omitted); *Tumbleston v. A.O. Smith Corp.*, 28 F. App'x 231, 235 (4th Cir. 2002). One way this burden can be met is by having a claimant's physicians "provide objective support for their diagnoses." *Hensley,* 123 F. App'x at 538.

However, this principle is not without limits: "a plan administrator cannot be willfully blind to medical information that may confirm the beneficiary's theory of disability where there is no evidence in the record to refute that theory." *Harrison*, 773 F.3d at 21; *see also id.* ("[O]nce a plan administrator is on notice that readily-available evidence exists that might confirm claimant's theory of disability, it cannot shut its eyes to such evidence where there is little in the record to suggest the claim deficient.").

Here, Plaintiff's physicians failed to "provide objective support for their diagnoses" and there was no available medical evidence that Defendant simply ignored. *See Hensley,* 123 F. App'x at 538. After checking with each of Plaintiff's doctors, none could provide a definitive medical statement that Plaintiff was disabled. The only statement suggesting disability came from Dr. McGlothlin, but it was undercut by the fact that Dr. McGlothlin was not restricting Plaintiff in line with his own disability assessment, and that he was basing his view on Plaintiff's own statements rather than a medical examination. Additionally, while Defendant could have conducted its own physical examination, such evidence was not "readily-available," as it did not yet exist and would have forced Defendant to incur large expenses to obtain. It would also completely undercut well-established burden of proof principles if Defendant was required to affirmatively create certain types of new evidence or else be considered "willfully blind."

Further, there was not "little in the record" to refute the theory that Plaintiff was disabled.

could substantiate her disability claim on just her epilepsy.").

25

*See Harrison*, 773 F.3d at 21. Almost every piece of evidence in the record could be interpreted to support a finding that Plaintiff was not disabled at the time of decisionmaking. Thus, the burden of proof rested on Plaintiff to demonstrate that he was still disabled.

### iv. Conclusion – Substantial Evidence Supported Defendant's Conclusion That Plaintiff Was Not Disabled

The record contains several independent sources of evidence demonstrating that Plaintiff was not disabled. There is also a lack of the type of evidence that would allow Plaintiff to prove his disability, such as definitive statements by medical professionals. Taking a broad view, Plaintiff's evidence essentially amounts to: (1) the documented fact that he has had serious spine and arm infirmities in the past, and (2) his own opinion that those infirmities continue to be as disabling as they once were. Plaintiff's evidence of his condition was ultimately based on his self-diagnosis, even if he reported that diagnosis to his doctors, who passed it along to Defendant.

The evidence that does exist points toward a lack of disability. While the surveillance video, interview, lack of current restrictions, and lack of any current medical treatment reflect limited information, the information that they contain suggests that Plaintiff is not disabled. The effect of the evidence on the record is compounded by the legal standards, that Plaintiff has the burden of proving his own disability and that Defendant's decision may be overturned only if it was an abuse of discretion. While reasonable minds may disagree as to whether the evidence definitively shows that Plaintiff is *not* disabled, it is clear that the evidence does not prove that Plaintiff *is* disabled. Thus, the record reflects that Defendant's decision was supported by adequate materials on the record.

26

### c. Conflict of Interest

The third factor to consider is whether Defendant's decision is tainted by a conflict of interest. The parties agree that Defendant had a "structural" conflict of interest in that it both paid Plaintiff's benefits and determined his eligibility to receive those benefits. *See Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 112 (2008). Defendant argues that the conflict was purely structural, rather than actual, because the fact that it provided benefits to Plaintiff for over two years while it investigated his case demonstrated its good faith. Plaintiff, on the other hand, alleges that some of the decisions made by Defendant are evidence of an actual conflict, such as the decision to spend money on less effective investigation methods (*e.g.* surveillance, interview) rather than simply order a cheaper medical examination to more definitively determine whether Plaintiff was disabled.

Generally, a structural conflict of interest is one of the factors to be weighed in determining whether an administrator's decision was an abuse of discretion. *Glenn*, 554 U.S. at 108. A conflict of interest is weighed more heavily, however, "where circumstances suggest a higher likelihood that it affected the benefits decision," including when "the other factors are closely balanced." *Id.* at 117–18. Conversely, a conflict of interest may be minimized in other situations such as when there was an "initial finding of disability, [defendant's] payment of longterm disability benefits for almost two years, and [defendant's] referral of its termination decision to two independent doctors." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 632 (4th Cir. 2010). Overall, "the significance of the factor will depend upon the circumstances of the particular case." *Glenn*, 554 U.S. at 108.

The circumstances in the present case do not point to the conflict of interest being weighed heavily. It is fair to conclude that the decision Defendant made was supported by

substantial evidence and the result of a reasoned process. And while Plaintiff makes a valid point about Defendant's decision not to order a physical examination, the case law is clear that administrators are not required to obtain any specific type of evidence, and that the burden of proof ultimately rests with the party seeking to prove disability. Thus, this is not a situation where the conflict of interest factor would serve as a "tiebreaker" in an otherwise close decision. *See Glenn*, 554 U.S. at 117.

Further, the circumstances of this case closely resemble those in *Williams*, where the court held the conflict of interest was minimized and the administrator was "not inherently biased." *Williams*, 609 F.3d at 632. Like in *Williams*, the Defendant here initially granted disability benefits and paid them for over two years. Although Defendant did not delegate its decision to independent doctors, it nonetheless sought out the opinion of Plaintiff's treating physicians at every possible turn. Thus, this could fairly be considered the type of case where the conflict of interest is minimized.

Under *Glenn*, the Court must weigh a conflict of interest as one of many factors, while considering the evidence as a whole. *Glenn* indicates that this is not the factual set that would dictate putting particular weight on the conflict of interest. Further, the conflict of interest is minimized in this case, where disability benefits were paid for over two years before their termination. Thus, the structural conflict of interest in this case does not change the overall analysis, that Defendant did not abuse its discretion in terminating Plaintiff's disability benefits.

### d. LWOP Claim

There is also the issue of whether Plaintiff's LWOP claim is procedurally proper. Defendant claims both that it was improperly plead and that it was not administratively exhausted. As to pleading, Defendant asserts that the complaint implicates only the LTD claim

explicitly. Alternatively, Defendant argues that because Plaintiff failed to appeal the LWOP claim, it is not administratively exhausted, and thus not ripe for adjudication by this Court. Plaintiff responds by arguing that the administrative record does not support a finding of failure to exhaust, or that he fits into an exception for futility even if he had failed to exhaust his administrative remedies.

Defendant's pleading argument is largely without merit. Plaintiff's complaint references both the LTD and LWOP policies as providing "disability benefits" (Dkt. 1 ¶¶ 8, 10). It then states a claim on the basis of the improper termination of those same "disability benefits." (*Id.* ¶ 17). Further, it alleges that the presence of the separate contracts for LTD and LWOP benefits, and claims relief on the basis of actions taken "[c]ontrary to the terms of the *contracts*." (*Id.* (emphasis added)). The complaint unambiguously states a claim for improper termination of the LWOP benefits.

As to exhaustion, "an ERISA claimant generally is required to exhaust the remedies provided by the employee benefit plan in which he participates as a prerequisite to an ERISA action for denial of benefits under 29 U.S.C. § 1132." *Makar v. Health Care Corp. of Mid-Atl. (CareFirst)*, 872 F.2d 80, 82 (4th Cir. 1989). Here, Plaintiff had a right to appeal the termination, so the question is whether Plaintiff actually did so in order to exhaust his administrative remedies. (*See* AR 232).

The record supports a finding that Plaintiff did not appeal his LWOP claim, and thus did not administratively exhaust his remedies. Plaintiff's notice of appeal letter referenced only the policy number for his LTD policy. (AR 141). Additionally, it stated explicitly that it was appealing the termination found in the September 5th letter from Defendant, while the LWOP termination occurred in a letter dated September 8th. (*Id.*; AR 1029). Finally, in a phone call with

a representative of Defendant during the appeal process, Plaintiff stated "this is not about life insurance" and was subsequently transferred to an LTD analyst. (AR 1019). The record demonstrates that Plaintiff did not appeal his LWOP termination, but instead only appealed the LTD decision.

Plaintiff is correct, however, that an appeal of his LWOP claims would be futile. A "clear and positive" showing of futility is required to suspend the exhaustion requirement for bringing an ERISA claim. *Makar*, 872 F.2d at 82. One way that such a showing can be made is by demonstrating that a decision had already been made under a less restrictive standard. *See DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 876 (4th Cir. 2011) ("DuPerry can hardly be blamed for not applying to LINA for benefits during the any-occupation period as LINA, having denied DuPerry's claim under the regular-occupation standard, would have surely denied a claim under the any-occupation standard as well.").

In this case, the parties agree that the LWOP coverage had the same or higher standard than LTD. (*See* Dkt. 85 at 20). Thus, like in *DuPerry*, there is no reason for Plaintiff — or the Court — to believe that an appeal of the LWOP claim would have resulted in anything other than a denial of the claim. Defendant argues that the LWOP appeal would have created a record that "could provide additional grounds to deny the LWOP claim that do not exist for the LTD claim." (Dkt. 86 at 20). However, Defendant fails to specify what these grounds could possibly be. Further, there is nothing to indicate that the LWOP appeal wouldn't have been based upon the exact same evidence before the Court today. The LWOP appeal, therefore, would have been futile. Thus, Plaintiff's LWOP claim is not barred by exhaustion and will be adjudicated by this Court.

### e. Remand

At oral argument, Plaintiff argued that this Court could remand the case back to Defendant for further evaluation as a potential remedy. Such remands are permissible. *See Hall*, 259 F. App'x at 595; *Berry v. Ciba-Geigy Corp.,* 761 F.2d 1003, 1007 n. 4 (4th Cir.1985). However, because the Court will grant Defendant's motion for summary judgment, remand would not be appropriate in this case.

### IV. Conclusion

The Court holds that no reasonable jury would find that Defendant abused its discretion in denying Plaintiff's benefits. Even construing the evidence in favor of the Plaintiff on Defendant's motion for summary judgment, Defendant's decision was not unreasonable. Further, the burden of proof was on Plaintiff to prove his own disability, which he failed to do. Finally, although Plaintiff's LWOP claim was not administratively exhausted, it was futile and did not need to meet the exhaustion requirements. Regardless of its exhaustion, the LWOP claim was properly denied by Defendant on the merits, as described by the reasoning of this opinion. In sum, Defendant did not abuse its discretion, and its motion for summary judgment will be **GRANTED**. Plaintiff's motion for summary judgment will be **DENIED**. An appropriate order will issue

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this __25th__ day of January, 2017

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE